**SHEEHAN & ASSOCIATES, P.C.**
Spencer Sheehan
505 Northern Blvd., Suite 311
Great Neck, NY 11021
Telephone: (516) 303-0552
Facsimile: (516) 234-7800
*spencer@spencersheehan.com*

  *-and-*

**REESE LLP**
Michael R. Reese
100 West 93rd Street, 16th Floor
New York, NY 10025
Telephone: (212) 643-0500
Facsimile: (212) 253-4272
*mreese@reesellp.com*


United States District Court
Southern District of New York        7:19-cv-11354

| |
|---|
| Alice Cartelli, individually and on behalf of all others similarly situated, |
|            Plaintiff, |
|      - against - |
| Danone US, Inc., |
|           Defendant |

Class Action Complaint

    Plaintiff by attorneys alleges upon information and belief, except for allegations pertaining to plaintiff, which are based on personal knowledge:

    1.   Danone US, Inc. ("defendant") manufactures, distributes, markets, labels and sells soy-based coffee creamer products purporting to be flavored exclusively with vanilla under their Silk brand ("Products").[1]

    2.   The Products are available to consumers from retail and online stores of third-parties

---

[1] Wikipedia contributors. "Mochi ice cream." Wikipedia, The Free Encyclopedia. 4 Nov. 2019. Web. 29 Nov. 2019.

and are sold in pints and quarts.

3.      The Product's front label identifies it as a "Dairy-Free Soy Creamer" and the front

and side panels make direct representations with respect to its primary recognizable and

characterizing flavor, by the word "Vanilla" and/or vignette.[2]

Front Panel          Side Panel

4.      The back panel includes the Nutrition Facts and ingredient list.

---

[2] 21 C.F.R. § 101.22(i).




## I.   Increase in Consumption of Non-Dairy, Plant-Based Milk Alternatives

5.   Over the past ten years, the number of dairy milk substitutes has proliferated to include "milks" (milk-like beverages) made from various agricultural commodities.

6.   Reasons for consuming non-dairy milks include avoidance of animal products due to health, environmental or ethical reasons, dietary goals or food allergies.[3]

7.   Two of the most popular milk alternatives are made from soybeans and almonds.

8.   Reasons for consumers choosing soymilk instead of almondmilk include tree nut allergies, creamier consistency, greater amount of soy protein and more B vitamins, magnesium and potassium.[4]

9.   Reasons for consumers choosing almondmilk instead of soymilk include soy allergies, sweeter taste, similar consistency to skim and low-fat milk, nutty flavor and higher levels of vitamin E.

---

[3] Margaret J. Schuster, et al. "Comparison of the Nutrient Content of Cow's Milk and Nondairy Milk Alternatives: What's the Difference?," *Nutrition Today* 53.4 (2018): 153-159.
[4]   Yahoo Food, Almond Milk Vs. Soy Milk: Which Is Better?, September 5, 2014.

10. Recent studies indicate that of the 7.2 million U.S. adults with food allergies, 3 million are allergic to tree nuts while 1.5 million are allergic to soy.[5]

11. Whether due to few people being allergic to soy and tree nuts (almonds) or the different qualities of each product type, consumers have preferences for one over the other and seldom switch between their "plant milk" of choice.

12. These plant-based beverages are typically mixed with a flavoring like vanilla or chocolate to increase its palatability and available in sweetened and unsweetened varieties.

II. Plant-Based Creamer Products

13. As consumers have embraced the variety of plant-based milks, their expectations for its use have increased as well.

14. Since traditional milk is often replaced with dairy creamers due to its thickness when paired with coffee, it is no surprise that the growing preference for plant-based milks means greater desire for plant-based creamers.

15. These non-dairy creamers have different functional properties than their milk counterparts because they are significantly thicker and creamier.

16. According to market research firm Datassential, over 50% of people surveyed use creamers instead of milk (traditional or plant-based) whether consuming coffee at home or away.[6]

17. According to one industry executive, non-dairy creamers "give[s] retailers a fresh way to appeal to their health-conscious and millennial-minded customers, while also helping the millions of Americans who put cream in their coffee move away from the unhealthy artificially

---

[5] Ruchi Gupta et al., "Prevalence and severity of food allergies among US adults," JAMA network open 2, no. 1 (2019): e185630-e185630.
[6] Beth Newhart, Trend alert: Plant-based creamers pick up as coffee category evolves, Nov. 28, 2018, Beveragedaily.com.

flavored, oil-based non-dairy creamers of the past."[7]

18.   Further, 83% of consumers are interested in using plant-based creamers because "consumers tend to believe plant-based creamers are healthier, more natural and taste better than dairy-based options," making them a perfect fit for coffee.[8]

III.   Vanilla is Constantly Subject to Efforts at Imitation Due to High Demand

19.   The tropical orchid of the genus Vanilla (*V. planifolia*) is the source of the prized flavor commonly known as vanilla, defined by law as "the total sapid and odorous principles extractable from one-unit weight of vanilla beans."[9]

20.   Vanilla's "desirable flavor attributes…make it one of the most common ingredients used in the global marketplace, whether as a primary flavor, as a component of another flavor, or for its desirable aroma qualities."[10]

21.   Though the Pure Food and Drugs Act of 1906 ("Pure Food Act") was enacted to "protect consumer health and prevent commercial fraud," this was but one episode in the perpetual struggle against those who have sought profit through sale of imitation and lower quality commodities, dressed up as the genuine articles.[11]

22.   It was evident that protecting consumers from fraudulent vanilla would be challenging, as E. M. Chace, Assistant Chief of the Foods Division of the U.S. Department of Agriculture's Bureau of Chemistry, noted "There is at least three times as much vanilla consumed

---

[7] Mary Ellen Shoup, Non-dairy creamer market growth driven by new flavors, Technomic says, Mar. 20, 2017, DAIRYreporter.com
[8] Newhart, *Id*.
[9] 21 C.F.R. §169.3(c).
[10] Daphna Havkin-Frenkel, F.C. Bellanger, Eds., Handbook of Vanilla Science and Technology, Wiley, 2018.
[11] Berenstein, 412; some of the earliest recorded examples of food fraud include unscrupulous Roman merchants who sweetened wine with lead.

[in the United States] as all other flavors together."[12]

23.     This demand could not be met by the natural sources of vanilla, leading manufacturers to devise clever, deceptive and dangerous methods to imitate vanilla's flavor and appearance.

24.     Today, headlines tell a story of a resurgent global threat of "food fraud" – from olive oil made from cottonseeds to the horsemeat scandal in the European Union.[13]

25.     Though "food fraud" has no agreed-upon definition, its typologies encompass an ever-expanding, often overlapping range of techniques with one common goal: giving consumers less than what they bargained for.

A.  Food Fraud as Applied to Vanilla

26.     Vanilla is considered a "high-risk [for food fraud] product because of the multiple market impact factors such as natural disasters in the source regions, unstable production, wide variability of quality and value of vanilla flavorings," second only to saffron in price.[14]

27.     The efforts at imitating vanilla offers a lens to the types of food fraud regularly employed across the spectrum of valuable commodities in today's interconnected world.[15]

|  Type of Food Fraud | Application to Vanilla |
| --- | --- |
| ➢  Addition of markers | •  Manipulation of the carbon isotope ratios to produce |

---

[12] E. M. Chace, "The Manufacture of Flavoring Extracts," Yearbook of the United States Department of Agriculture 1908 (Washington, DC: Government Printing Office, 1909) pp.333–42, 333 quoted in Nadia Berenstein,  "Making a global sensation: Vanilla flavor, synthetic chemistry, and the meanings of purity," History of Science 54.4 (2016): 399-424 at 399.

[13] Jenny Eagle, 'Today's complex, fragmented, global food supply chains have led to an increase in food fraud', FoodNavigator.com, Feb. 20, 2019; M. Dourado et al., Do we really know what's in our plate?. Annals of Medicine, 51(sup1), 179-179 (May 2019); Aline Wisniewski et al., "How to tackle food fraud in official food control authorities in Germany." Journal of Consumer Protection and Food Safety: 1-10. June 11, 2019.

[14] Société Générale de Surveillance SA, ("SGS "), Authenticity Testing of Vanilla Flavors – Alignment Between Source Material, Claims and Regulation, May 2019.

[15] Kathleen Wybourn, DNV GL, Understanding Food Fraud and Mitigation Strategies, PowerPoint Presentation, Mar. 16, 2016.

| | |
|---|---|
| specifically tested for instead of natural component of vanilla beans | synthetic vanillin with similar carbon isotope composition to natural vanilla |
| ➢ Appearance of *more* and/or higher quality of the valued ingredient | • Ground vanilla beans and/or seeds to provide visual appeal as "specks" so consumer thinks the product contains real vanilla beans, when the ground beans have been exhausted of flavor<br>• Caramel to darken the color of an imitation vanilla so it more closely resembles the hue of real vanilla[16]<br>• Annatto and turmeric extracts in dairy products purporting to be flavored with vanilla, which causes the color to better resemble the hue of rich, yellow butter |
| ➢ Substitution and replacement of a high quality ingredient with alternate ingredient of lower quality | • Tonka beans, though similar in appearance to vanilla beans, are banned from entry to the United States due to fraudulent use<br>• Coumarin, a toxic phytochemical found in Tonka beans, added to imitation vanillas to increase vanilla flavor perception |
| ➢ Addition of less expensive substitute ingredient to mimic flavor of more valuable component | • Synthetically produced ethyl vanillin, derived from recycled paper, tree bark or coal tar, to imitate taste of real vanilla |
| ➢ Compounding, Diluting, Extending | • "to mix flavor materials together at a special ratio in which they [sic] compliment each other to give the desirable aroma and taste"[17]<br>• Combination with flavoring substances such as propenyl |

---

[16] Renée Johnson, "Food fraud and economically motivated adulteration of food and food ingredients." Congressional Research Service R43358, January 10, 2014.
[17] Chee-Teck Tan, "Physical Chemistry in Flavor Products Preparation: An Overview" in Flavor Technology, ACS Symposium Series, Vol. 610 1995. 1-17.

guaethol ("Vanitrope"), a "flavoring agent [, also] unconnected to vanilla beans or vanillin, but unmistakably producing the sensation of vanilla"[18]

- "Spiking" or "fortification" of vanilla through addition of natural and artificial flavors including vanillin, which simulates vanilla taste but obtained from tree bark

➢ Addition of fillers to give the impression there is more of the product than there actually is

- Injection of vanilla beans with mercury, a poisonous substance, to raise the weight of vanilla beans, alleged in *International Flavors and Fragrances (IFF), Inc. v. Day Pitney LLP and Robert G. Rose,* 2005, Docket Number L-4486-09, Superior Court of New Jersey, Middlesex County.

- Subtle, yet deliberate misidentification and obfuscation of a product's components and qualities as they appear on the ingredient list
  - "ground vanilla beans" gives impression it describes unexhausted vanilla beans when actually it is devoid of flavor and used for aesthetics

➢ Ingredient List Deception[19]

  - "natural vanilla flavorings" – "-ing" as suffix referring to something *like* that which is described
  - "Vanilla With Other Natural Flavors" – implying – wrongly – such a product has a sufficient amount of vanilla to characterize the food; often containing high amount of vanillin, which must be disclosed as an *artificial* flavor when paired with vanilla

B.  The Use of Vanillin to Simulate Vanilla

---

[18] Berenstein, 423.
[19] Recent example of this would be "evaporated cane juice" as a more healthful sounding term to consumers to identify sugar.

28.   The most persistent challenger to the authenticity of real vanilla has been synthetic versions of its main flavor component, vanillin.

29.   First synthesized from non-vanilla sources by German chemists in the mid-1800s, vanillin was the equivalent of steroids for vanilla flavor.

30.   According to Skip Rosskam, a professor of vanilla at Penn State University and former head of the David Michael flavor house in Philadelphia, "one ounce of vanillin is equal to a full gallon of single-fold vanilla extract."[20]

31.   Today, only 1-2% of vanillin in commercial use is vanillin obtained from the vanilla plant, which means that almost all vanillin has no connection to the vanilla bean.

32.   Nevertheless, disclosure of this powerful ingredient has always been required where a product purports to be flavored with vanilla. *See* Kansas State Board of Health, Bulletin, Vol. 7, 1911, p. 168 (cautioning consumers that flavor combinations such as "vanilla and vanillin…vanilla flavor compound," etc., are not "vanilla [extract] no matter what claims, explanations or formulas are given on the label.").

33.   Since vanilla is the only flavor with its own standard of identity, its labeling is controlled not by the general flavor regulations but by the standards for vanilla ingredients.

34.   This means that if a product is represented as being characterized by vanilla yet also contains non-vanilla vanillin, the label and packaging must declare the presence of vanillin and identify it as an artificial flavor. *See* Vanilla-vanillin extract at 21 C.F.R. § 169.180(b) ("The specified name of the food is "Vanilla-vanillin extract _-fold" or "_-fold vanilla-vanillin extract", followed immediately by the statement "contains vanillin, an artificial flavor (or flavoring)".); *see also* 21 C.F.R. § 169.181(b), § 169.182(b) (similar declarations required for Vanilla-vanillin

---

[20] Katy Severson, Imitation vs. Real Vanilla: Scientists Explain How Baking Affects Flavor, Huffington Post, May 21, 2019.

flavoring and Vanilla-vanillin powder).

35.    This prevents consumers from being misled by products which may taste similar to real vanilla and but for consumer protection requirements, would be sold at the price of real vanilla.

C.    "Natural Vanillins" are Produced in a Non-Natural Manner

36.    The past ten years have seen the introduction of vanillin ingredients that purport to be a "natural flavor," based on the raw material being a natural source and undergoing a natural production process.

37.    While vanillin can be made in an allegedly "natural" fermentation process from ferulic acid, the cost is prohibitive for use in most applications.

38.    When eugenol, from cloves are used to produce vanillin, it is subject to chemical reactions and processes considered to be synthetic by the FDA.

39.    These low-cost "natural vanillins" are produced by the ton in China, with little transparency or verification, before being delivered to the flavor companies for blending.

D.    Vanilla "WONF" to Imitate Real Vanilla

40.    The global shortage of vanilla beans has forced the flavor industry to "innovate[ing] natural vanilla solutions…to protect our existing customers."[21]

41.    These "customers" do not include the impoverished vanilla farmers who are at the mercy of global conglomerates nor consumers, who are sold products labeled as "vanilla" for the same or higher prices than when those products contained *only* vanilla.

42.    The flavor industry has reacted to the high vanilla prices with programs like the "Sustainable Vanilla Initiative" and "Rainforest Alliance Certified."

---

[21] Amanda Del Buono, Ingredient Spotlight, Beverage Industry, Oct. 3, 2016.

43.    However, these initiatives have been silently questioned among the vanilla farmers of Madagascar, where there have been whispers that contrary to seeking "sustainability" of vanilla, the food and flavor conglomerates are actually working in the opposite direction.

44.    This entails paying Madagascar vanilla farmers to destroy their vanilla crops instead of taking the uncured beans to market.

45.    Fewer vanilla beans means higher prices, which benefit the flavor industry because products like vanilla extract have low margins – there is no advanced synthetic biology or proprietary formula for this basic, yet essential ingredient.

46.    While this conclusion is not directly stated, it is apparent from the comments of industry executives.

47.    According to Suzanne Johnson, vice president or research at a North Carolina laboratory, "Many companies are trying to switch to natural vanilla with other natural flavors [WONF] in order to keep a high-quality taste at a lower price."

48.    The head of "taste solutions" at Irish conglomerate Kerry, urged flavor manufacturers to "[G]et creative" [read: deceptive] and "build a compounded vanilla flavor with other natural flavors."

49.    These compounded flavors typically exist in a "black box" and "consist of as many as 100 or more flavor ingredients," blended together in a special ratio to complement and enhance the vanilla component.[22]

50.    A compounded vanilla flavor "that matches the taste of pure vanilla natural extracts" can supposedly "provide the same vanilla taste expectation while requiring a smaller quantity of

---

[22] Hallagan and Drake, FEMA GRAS and U.S. Regulatory Authority: U.S. Flavor and Food Labeling Implications, Perfumer & Flavorist, Oct. 25, 2018; Charles Zapsalis et al., *Food chemistry and nutritional biochemistry*. Wiley, 1985, p. 611 (describing the flavor industry's goal to develop vanilla compound flavors "That *Seem*[s] to be Authentic or at Least Derived from a Natural Source") (emphasis added).

vanilla beans. The result is a greater consistency in pricing, availability and quality."[23]

51.     That high level executives in the flavor industry are willing to openly boast of their stratagems to give consumers less vanilla for the same price is not unexpected.

52.     This is due in part to the once powerful trade group for the flavor industry, The Flavor and Extract Manufacturers Association ("FEMA"), abandoning its "self-policing" of misleading vanilla labeling claims and disbanding its Vanilla Committee.

53.     Though FEMA previously opposed efforts of industry to deceive consumers, its recent leaders have cast the general public to the curb in pursuit of annual fees from its largest members.

IV. The Unqualified Representations as "Vanilla" are Misleading

54.     The front label (1) represents the Product's characterizing flavor is vanilla and (2) the absence of any qualifying terms confirms to consumers they contain a sufficient amount of the characterizing food ingredient, vanilla (flavoring or extract) to independently flavor the Products.

A.   Product's Ingredient Lists Reveal Ambiguous "Natural Flavor"

55.     The unqualified, prominent and conspicuous representations as "Vanilla" is false, deceptive and misleading because the Products contain flavoring other than vanilla, as revealed by "Natural Flavor" on the ingredient list.

---

[23] Donna Berry, Understanding the limitations of natural flavors, BakingBusiness.com, Jan. 16, 2018.



**INGREDIENTS:** SOYMILK (FILTERED WATER, SOYBEANS), CANE SUGAR, PALM OIL, MALTODEXTRIN, CONTAINS 2% OR LESS OF: SOY LECITHIN, NATURAL FLAVOR, TAPIOCA STARCH, LOCUST BEAN GUM, DIPOTASSIUM PHOSPHATE.

B.   In the Context of Vanilla Ingredients for Vanilla Labeled Products, "Natural Flavor" Refers to a Vanilla Component Mixed with Non-Vanilla Flavors

56.   "Natural flavor" refers to "the essential oil, oleoresin, essence or extractive…which contains the flavoring constituents" from a natural source such as plant material and can refer to combinations of natural flavors.[24]

57.   When companies use vanilla and non-vanilla flavors in a product, they are typically purchased in one package or container.

58.   Reasons for doing this include: (1) having to manage fewer suppliers, (2) ensuring the vanilla and non-vanilla flavors complement each other, (3) the non-vanilla flavors are intended to resemble, simulate and enhance the vanilla flavor, (4) consistency within product batches the flavor is added to, (5) volatile nature of flavoring constituents, (6) the ability to make misleading representations with respect to a product's flavor and ingredients and (7) ease of use.

59.   When a food manufacturer receives a flavor component from a flavor supplier that consists of two or more natural flavor ingredients, it can be labeled by declaring each ingredient by its  common or usual name such as "strawberry flavor, banana flavor."[25]

60.   Flavorings are not subject to the provisions which allow for the components of an ingredient to be incorporated into the statement of ingredients in order of predominance by weight,

---

[24] 21 C.F.R. § 101.22(a)(3).
[25] 21 C.F.R. § 101.22(g)(2).

such that when "strawberry flavor, banana flavor" is added to a fabricated food, it will be designated as "natural flavor."[26]

61.    The ingredient most commonly used to provide flavors from vanilla and non-vanilla natural sources is known as "Vanilla With Other Natural Flavors" or "Vanilla WONF."[27]

62.    On the ingredient list, this ingredient is often declared inconsistently, without uniformity and in a misleading way: "Natural Vanilla Flavor with Other Natural Flavor," "Natural Vanilla Flavor, Natural Flavor," "Vanilla Extract, Natural Flavor" "Natural Flavor, [INTERVENING INGREDIENTS] Vanilla Extract," instead of the required "Natural Flavor."

63.    If it were permitted to separate ("split" as in "ingredient splitting") the components of the natural flavor – i.e., vanilla extract and natural flavor – and insert them into the ingredient list in order of predominance by weight, a manufacturer could draw undue and misleading attention to the more valuable component (i.e., vanilla extract) of the combination ingredient, giving consumers the impression that sub-component is present in an amount greater than it actually is.

64.    Defendant's identification of the flavor ingredient as "Natural Flavor" is consistent with the relevant regulations, which require only a declaration of "natural flavor."

65.    Where a product is characterized by a flavor – i.e., raspberry, hazelnut, etc. – and contains flavor "from the product whose flavor is simulated and other natural flavor which simulates, resembles or reinforces the characterizing flavor," the front label is required to state

---

[26] *See* 21 C.F.R. § 101.4(b)(1) ("Spices, flavorings, colorings and chemical preservatives shall be declared according to the provisions of 101.22.") *with* 21 C.F.R. § 101.22(h)(1) ("The label of a food to which flavor is added shall declare the flavor in the statement of ingredients in the following way: (1) Spice, natural flavor, and artificial flavor may be declared as "spice", "natural flavor", or "artificial flavor", or any combination thereof, as the case may be.")

[27] 21 C.F.R. § 101.22(i)(1)(i) ("If the food is one that is commonly expected to contain a characterizing food ingredient, e.g., strawberries in "strawberry shortcake", and the food contains natural flavor derived from such ingredient and an amount of characterizing ingredient insufficient to independently characterize the food").

"[CHARACTERIZING FLAVOR] + FLAVORED + WONF."[28]

66.    However, the Product lacks the terms "flavored," "with other natural flavors," and "non-vanilla flavors," and makes no attempt to tell consumers of the non-vanilla flavors.  *See* 21 C.F.R. § 101.22(i)(1)(i) ("If the food is one that is commonly expected to contain a characterizing food ingredient, e.g., strawberries in "strawberry shortcake", and the food contains natural flavor derived from such ingredient and an amount of characterizing ingredient insufficient to independently characterize the food").

67.    Consumers will expect the Product contains only vanilla for flavoring, and in a sufficient amount to flavor the Product, without being "enhanced" or "reinforced" by flavor enhancers like maltol and piperonal or boosted by synthetic vanillin.

68.    Even if a consumer were to review the ingredient list, the deception would not be cured.

69.    This is because they will think that "Natural Flavor" refers to an exclusively vanilla flavoring ingredient.

70.    In fact, the "Natural Flavor" contains non-vanilla flavor and/or artificial vanilla flavors.

V.    Laboratory Analysis Reveals Prevalence of Non-Vanilla Flavors in Vanilla Products

71.    Gas chromatography-mass spectrometry ("GC-MS") and high-performance liquid chromatography ("HP-LC") are scientific techniques which can detect flavor compounds and match them to a database of known compounds, similar to a fingerprint database.

---

[28] 21 C.F.R. § 101.22(i)(1)(iii) ("If the food contains both a characterizing flavor from the product whose flavor is simulated and other natural flavor which simulates, resembles or reinforces the characterizing flavor, the food shall be labeled in accordance with the introductory text and paragraph (i)(1)(i) of this section and the name of the food shall be immediately followed by the words "with other natural flavor" in letters not less than one-half the height of the letters used in the name of the characterizing flavor.")

72.  These methods are relevant to determining whether a product's flavoring is derived from the vanilla bean or synthetic alternatives, by recognizing the four marker compounds typically associated with vanilla, present in consistent amounts:

| Compounds | Percent Present in Vanilla Beans |
|---|---|
| vanillin | 1.3-1.7 % |
| p-hydroxybenzaldehyde | 0.1% |
| vanillic acid | 0.05% |
| p-hydroxybenzoic acid | 0.03% |

73.  Analysis of the Products by GC-MS and/or HP-LC has or is likely to show skewed ratios of these compounds and/or the non-detection of certain marker compounds.

74.  When products which are known to contain "Vanilla With Other Natural Flavor" are analyzed, the results are remarkably uniform, revealing a *de minimis* amount of vanilla but significant amounts of artificial vanillin.

75.  It can be determined that the vanillin is not from vanilla beans because (1) the ratios of the marker compounds is skewed relative to their presence in natural vanilla and/or (2) certain of the marker compounds are not detectable or are present in trace amounts.

76.  The high probability that the Product contains vanillin from a non-vanilla source, means the flavor ingredient used is incorrectly labeled "Natural Flavor."

77.  Accepting for the sake of argument the "Natural Flavor" contains one drop of vanilla in a sea of vanillin, such an ingredient is actually considered a vanilla-vanillin combination ingredient.[29]

78.  This means that regardless of whether the non-vanilla vanillin qualifies as "natural" based on a theoretical and unverified production process, the labeling for such ingredients is

---

[29] 21 C.F.R. § 169.180 (Vanilla-vanillin extract), § 169.181 (Vanilla-vanillin flavoring).

controlled by the vanilla standards as opposed to the general flavoring regulations wherever there is a conflict between them.

79.    A vanilla-vanillin combination ingredient is required to be designated on the ingredient list "followed immediately by the statement 'contains vanillin, an artificial flavor (or flavoring).'"[30]

80.    The front label implication of such an ingredient requires such a Product to declare the presence of vanillin and/or artificial flavor.

81.    These requirements were established to prevent consumers from being misled by products which "fortify," "boost" or "spike" a miniscule amount of real vanilla with synthetic vanillin.

82.    Otherwise, consumers would pay more money for products that may taste like vanilla even though the taste is not derived from vanilla beans.

VI.    Conclusion

83.    The proportion of the characterizing component, vanilla, has a material bearing on price or consumer acceptance of the Product because it is more expensive and desired.

84.    The representations are misleading because the Product does not contain the amount, type and/or percentage of vanilla as a component of its flavoring, which is required by law and consistent with consumer expectations.

85.    Had plaintiff and class members known the truth, they would not have bought the Product or would have paid less for it.

86.    The Product contains other representations which are misleading and deceptive.

87.    As a result of the false and misleading labeling, the Product is sold at a premium

---

[30] 21 C.F.R. § 169.180(b), § 169.181(b).

17

price, approximately no less than $5.39 per 32 FL OZ, excluding tax – compared to other similar products represented in a non-misleading way.

## Jurisdiction and Venue

88.  Jurisdiction is proper pursuant to 28 U.S.C. § 1332(d)(2) (Class Action Fairness Act of 2005 or "CAFA").

89.  Under CAFA, district courts have "original federal jurisdiction over class actions involving (1) an aggregate amount in controversy of at least $5,000,000; and (2) minimal diversity[.]" *Gold v. New York Life Ins. Co.*, 730 F.3d 137, 141 (2d Cir. 2013).

90.  Upon information and belief, the aggregate amount in controversy is more than $5,000,000.00, exclusive of interests and costs.

91.  This is a reasonable assumption because defendant's Product is sold in thousands of stores across all 50 states.

92.  Plaintiff Alice Cartelli is a citizen of New York.

93.  Defendant Danone US, Inc. is a Delaware corporation with a principal place of business in Broomfield, Broomfield County, Colorado.

94.  This court has personal jurisdiction over defendant because it conducts and transacts business, contracts to supply and supplies goods within New York.

95.  Venue is proper because plaintiff and many class members reside in this District and defendant does business in this District and State.

96.  A substantial part of events and omissions giving rise to the claims occurred in this District.

## Parties

97.  Plaintiff Alice Cartelli is a citizen of Dutchess County, New York.

18

98.  Defendant is a Delaware corporation with a principal place of business in Broomfield, Broomfield County, Colorado.

99.  During the class period, plaintiff purchased one or more of the Products identified herein, in his or her district and/or state, for personal use, consumption or application based on the above representations, for no less than the price indicated, *supra*, excluding tax,

100.  Plaintiff would consider purchasing the Product again if there were assurances that the Product's representations were no longer misleading.

<u>Class Allegations</u>

101.  The classes will consist of all consumers in New York and the other 49 states and a nationwide class where applicable.

102.  Common questions of law or fact predominate and include whether the representations were likely to deceive reasonable consumers and if plaintiff and class members are entitled to damages.

103.  Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same representations.

104.  Plaintiff is an adequate representative because his or her interests do not conflict with other members.

105.  No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

106.  Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest.

107.  Plaintiff's counsel is competent and experienced in complex class action litigation and intends to adequately and fairly protect class members' interests.

108.  Plaintiff seeks class-wide injunctive relief because the practices continue.

<u>New York General Business Law ("GBL") §§ 349 & 350</u>

109.  Plaintiff asserts causes of action under the consumer protection statutes of New York, General Business Law ("GBL") §§ 349 & 350.

110.  Defendant's acts and omissions are not unique to the parties and have a broader impact on the public.

111.  Plaintiff and class members desired to purchase products which were as described by defendant and expected by reasonable consumers, given the product type.

112.  Defendant's acts and omissions are not unique to the parties and have a broader impact on the public.

113.  Defendant's conduct was misleading, deceptive, unlawful, fraudulent, and unfair because it gives the impression to consumers the Products contain sufficient amounts of the highlighted ingredient, vanilla, to characterize the taste or flavor of the Products and only contain said ingredient to flavor the Product.

<u>Negligent Misrepresentation</u>

114.  Plaintiff incorporates by reference all preceding paragraphs.

115.  Defendant misrepresented the substantive, quality, compositional, organoleptic and/or nutritional attributes of the Products through misrepresenting the amount, quantity and/or proportion of the flavoring ingredient.

116.  Defendant had a duty to disclose and/or provide non-deceptive labeling of the Product and its components and ingredients, and knew or should have known same were false or misleading.

117.  This duty is based on defendant's position as an entity which has held itself out as having special knowledge and experience in the production, service and/or sale of the product or

service type.

118.  The representations took advantage of consumers' (1) cognitive shortcuts made at the point-of-sale and (2) trust placed in defendant, a well-known and respected brand in this sector.

119.  Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, the purchase of the Products.

120.  Plaintiff and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

<u>Breaches of Express Warranty, Implied Warranty of Merchantability and<br>Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, <i>et seq.</i></u>

121.  Plaintiff incorporates by reference all preceding paragraphs.

122.  Defendant manufactures and sells products which purport to contain sufficient amounts of the highlighted ingredient, vanilla, to characterize the taste or flavor of the Products, which is desired by consumers.

123.  The Products warranted to Plaintiff and class members that they possessed substantive, functional, nutritional, qualitative, compositional, organoleptic, sensory, physical and other attributes which they did not due to the presence or absence of the aforementioned ingredient.

124.  Defendant had a duty to disclose and/or provide a non-deceptive description and identification of the Product and its ingredients.

125.  This duty is based, in part, on defendant's position as one of the most recognized companies in the nation in this sector.

126.  Plaintiff provided or will provide notice to defendant, its agents, representatives, retailers and their employees.

127.  The Product did not conform to its affirmations of fact and promises due to

defendant's actions and were not merchantable.

128.  Plaintiff and class members relied on defendant's claims, paying more than they would have.

<u>Fraud</u>

129.  Plaintiff incorporates by references all preceding paragraphs.

130.  Defendant's purpose was to sell a product which purported to contain valuable and desired characterizing ingredients and/or flavors, and represent the Products were exclusively flavored by the designated ingredients and contained sufficient independent amounts of same.

131.  Defendant's fraudulent intent is evinced by its failure to accurately indicate the Products contained less of the desired ingredient or none at all.

132.  Plaintiff and class members observed and relied on defendant's claims, causing them to pay more than they would have, entitling them to damages.

<u>Unjust Enrichment</u>

133.  Plaintiff incorporates by reference all preceding paragraphs.

134.  Defendant obtained benefits and monies because the Product were not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

  **WHEREFORE**, Plaintiff prays for judgment:

1.  Declaring this a proper class action, certifying Plaintiff as representative and undersigned as counsel for the class;

2.  Entering preliminary and permanent injunctive relief by directing defendant to correct the

challenged practices to comply with the law;

3. Injunctive relief to remove and/or refrain from the challenged representations, restitution and disgorgement for members of the State Subclasses pursuant to the consumer protection laws of their States;

4. Awarding monetary damages and interest, including treble and punitive damages, pursuant to the common law and consumer protection law claims, and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated:   December 12, 2019

Respectfully submitted,

Sheehan & Associates, P.C.
/s/Spencer Sheehan
Spencer Sheehan
505 Northern Blvd., Suite 311
Great Neck, NY 11021
Telephone: (516) 303-0552
Facsimile: (516) 234-7800
*spencer@spencersheehan.com*
E.D.N.Y. # SS-8533
S.D.N.Y. # SS-2056

*-and-*

Reese LLP
Michael R. Reese
100 West 93rd Street, 16th Floor
New York, NY 10025
Telephone: (212) 643-0500
Facsimile: (212) 253-4272
*mreese@reesellp.com*

7:19-cv-11354
United States District Court
Southern District of New York

Alice Cartelli, individually and on behalf of all others similarly situated,

                                  Plaintiff,

          - against -

Danone US, Inc.,

                                  Defendant

## Class Action Complaint

```
            Sheehan & Associates, P.C.
             505 Northern Blvd., #311
               Great Neck, NY 11021
               Tel: (516) 303-0552
               Fax: (516) 234-7800
```

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information, and belief, formed after an inquiry reasonable under the circumstances, the contentions contained in the annexed documents are not frivolous.

Dated:  December 12, 2019

                                          /s/ Spencer Sheehan
                                          Spencer Sheehan